William B. Hanson
KASTING, KAUFFMAN & MERSEN, P.C.
716 S. 20th Ave., Ste. 101
Bozeman, MT 59718
Phone: (406) 586-4383
Facsimile: (406) 587-7871
Email:   bhanson@kkmlaw.net

Attorneys For Plaintiff



## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## BUTTE DIVISION

| | |
|---|---|
| LEE WALTER PROVANCE,<br><br>        Plaintiff,<br><br>vs.<br><br>GALLATIN COUNTY, a political<br>subdivision of the State of Montana,<br><br>        Defendant. | Case No.: CV-13-81-BU-DLC<br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff alleges:

### NATURE OF ACTION

1.     This is an action under Title I of the Americans with Disabilities

Act of 1990 ("ADA"), as amended, and Title I of the Civil Rights Act of 1991,

COMPLAINT - 1

to correct unlawful employment practices committed by Gallatin County on the basis of disability, and to provide appropriate relief to Lee Walter Provance ("Provance") who was harmed by those practices. Gallatin County constructively discharged Provance because of his opposition to practices made unlawful by the ADA.

## JURISDICTION AND VENUE

2.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331. This action is authorized and instituted pursuant to 42 U.S.C. § 12117(a), which incorporates by reference 42 U.S.C. §2000e-4 through 2000e-9, and 42 U.S.C. §1981a.

3.      The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Montana within the geographical boundaries of the Butte Division.

4.      Provance received notice of his right to institute a civil action against Gallatin County from the United States Department of Justice within 90 days before filing this Complaint.

## PARTIES

5.      At all relevant times, Provance was a resident of Gallatin County, Montana, and a citizen of the State of Montana.

6.     At all relevant times, Gallatin County was a political subdivision of the State of Montana.

7.     At all relevant times, Gallatin County was a covered entity under 42 U.S.C. § 12111(2).

## STATEMENT OF FACTS

8.     Provance worked for Gallatin County from March 6, 2000, through October 26, 2012, as the Road and Bridge Superintendent.

9.     Before September 11, 2012, Provance had a perfect, unblemished employment record as indicated by his personnel file, with one exception described in paragraph 14.

10.    During a Spring staff meeting in 2010, which included all Gallatin County Department Heads and elected officials, those present, including Provance, were told that the voluntary blood testing during the health fair, which was part of the County's wellness program, would come with the condition that anyone refusing to "voluntarily" give blood would be fined $50 per month for non-compliance.

11.    Provance immediately raised questions at the meeting about the legality of the wellness program, such as, "How could it possibly be considered 'voluntary' if we were to be fined for non-compliance?," and "Isn't this a violation of law?". Gallatin County Commissioner Joe Skinner

said in front of all staff that he "did not care" and would not address Provance's questions.

12.   Provance persisted since that time to get answers to his questions and the program was implemented on January 1, 2011, without a legal explanation being provided by any County official.

13.   Provance had several conversations and email communications with the County Commissioners, Earl Mathers (the County Administrator) ("Mathers"), and Cynde Hertzog (the County Human Resources Director) ("Hertzog"), about his position (and that of his employees) that this was a discriminatory policy as evidenced in emails between December 2, 2011, and February 23, 2012.

14.   Mathers addressed Provance's opposition in Mathers' February 24, 2012, performance appraisal of Provance's work. Mathers wrote, "My one concern this year involved Lee's strident opposition to the County Wellness Program." Mathers had knowledge that Provance had supported the County's efforts to offer the program as evidenced in his February 23, 2012, email to him, except for its involuntary nature, but Mathers chose to ignore the facts on his evaluation and refused to discuss the legality of the blood testing during the evaluation.

15.   There was one incident with Mathers in April, 2012, that factors

into later disciplinary action that was taken against him. This incident motivated Mather's use of practices that violated the ADA. The City of Bozeman was doing upgrades to its water treatment facility and destroyed a County road in the process. The City wanted Provance to increase the weight limits that Provance had imposed to preserve what was left of the road, so a meeting with Mathers and Provance was arranged to discuss the issue.

16. Mathers said the City could use the road (and thereby continue destroying it) without providing any written guarantee to repair the road (a $500,000 liability), despite Provance's objection. Provance stated in front of everyone that Mathers did not have the statutory authority to make the decision and he was not Provance's boss.

17. After getting the City's agreement to a written guarantee, Provance went to Mather's office to discuss the issue further. Mathers told him that he was too mad to even look at him and told him to leave, but did not ever argue the point that he was not Provance's boss. Under section 7-14-2301, MCA, the County Board of Commissioners was Provance's supervisor.

18. At that time, Provance had no idea that the County Commissioners had attempted to make Mathers his supervisor until

Mathers took disciplinary action against him on September 12, 2012. Provance was always told by the Commission that Mathers was only to perform administrative functions such as conducting performance reviews and reviewing leave requests. Commissioner Bill Murdock stated to him in June, 2012 (as was stated on many other occasions), "Road and Bridge will never be under the County Administrator; he is not your boss, we are."

19. Provance had discussed with the Commissioners and Mathers beginning in June, 2012, that Provance could not lift his arms due to shoulder pain and may have to get surgery during the construction season.

20. On August 6, 2012, Provance told the County Commissioners and Mathers that Provance was scheduled for surgery on August 8, 2012, to repair his right rotator cuff and again in November to repair the left one. The surgeon was going to notify them that Provance could not drive for 3 months. Commissioner Murdock stated, "You can't do that, that's what you do for a living." Provance agreed with Commissioner Murdock and told them that Provance had every intention of finding a surgeon that would not limit his ability to drive for that long, so Provance could fulfill his work obligations to the County during the busy time of year.

21. Provance met with another surgeon on August 15, 2012, and notified the Commissioners and Mathers that day that he was scheduled

again for surgery, this time on Friday, August 17, 2012, and there would be no restrictions on his ability to work other than Provance would not be able to use his right arm for anything, had to be careful not to re-injure it, and Provance would return to work without taking time off, drug-free. There was no opposition by them to this, nor were any conditions imposed by anyone for the next three weeks and four days.

22.    Provance returned to work on Monday, August 20, 2012, without restrictions.

23.    On September 6, 2012, Provance told the Commissioners and Mathers that the majority of the large construction contracts had been fulfilled satisfactorily and Provance would be taking time off during the weeks ahead to recuperate. Everyone agreed. Provance also had a significant amount of accumulated sick time to cover his periodic opportunities to get away from work now and then to rest and recuperate.

24.    On September 11, 2012, at about 11 a.m., three weeks and four days after Provance returned to work, as Provance was driving home for the day to rest, Provance received a call from Mathers, stating that Provance needed to go immediately to the County's administrative offices to sign some forms. "What forms?," Provance asked. Mathers said that he had spoken to his doctor and had some restrictions for him to sign. Before this,

Mathers had implied that Provance was lying about the lack of restrictions over the past few weeks, but Provance could not believe that Mathers would go to his doctor without his consent. Provance raised his voice and asked him over the phone, "Who the hell gave you consent to do that?"

25. In his experience as a Department Head for twelve and one-half years, it was unprecedented to take such action without Human Resources contacting an individual to sign the appropriate release forms. If Provance would have refused to sign such a form, Provance would have expected disciplinary action at that point and a requirement to sign the form before contacting his physician's office.

26. Provance later learned that Mathers had not spoken to his doctor at all, as Mathers had originally told him; but rather, Mathers had had a County employee talk to his physician's assistant. When Provance spoke to the PA, the PA told Provance that someone from work had called and said Provance "needed restrictions in order to return to work," and that he, the PA, had then filled out a form. The PA did not realize that Provance had not given his consent and filled out a form for Mathers that Provance had not seen before.

27. After hanging up on Mathers, Provance turned his vehicle around and went to the County's administrative offices. Provance spoke to

Commissioner Joe Skinner about the incident and how Provance thought it should be resolved. Commissioner Skinner was not concerned at all, so Provance went to Mathers' office and angrily referred to him in a pejorative manner, and said he would sue him for violating his privacy without seeking consent.

28.   The next day, September 12, 2012, Provance was informed that Provance was to meet with Mathers and two County Commissioners about his alleged unprofessional behavior. The Commissioners refused to discuss Mathers' illegal conduct at the un-noticed, illegal meeting, and were only concerned about his brief display of anger in Mathers' office. Provance disagreed with their assessment of the situation, but was nevertheless placed on a three day suspension without pay, even though Provance had never been disciplined for anything before and did not threaten to harm anyone.

29.   On Saturday, September 15, 2012, (during his suspension) Provance received a letter from Mathers that stated Provance was terminated from his position and had five days to respond. Provance was emotionally devastated. Provance responded on Monday, September 17, 2012, and apologized for his anger and words in order to get his job back, although Provance did not agree with the harshness of the suspension and

termination to begin with. Provance's greatest fear was to be discharged for "gross misconduct" which would result in the loss of his benefits and greatly affect his planned November surgery on his other shoulder.

30.   On Wednesday, September 19, 2012, just before a meeting with Mathers and the two Commissioners, Provance was furnished an agreement by Hertzog which would allow the County to have access to all of his medical and psychological information and treatment, and another agreement pursuant to which Provance would have to meet with a health care provider from the County's Employee Assistance Program for what Provance understood was to be a counseling appointment. Provance did not read the agreement and reluctantly signed it only because Provance was told it was the only choice Provance had if Provance wanted to keep his job.

31.   On October 1, 2012, Provance went to the Commissioners' office and spoke with Commissioner Bill Murdock who had just returned from a lengthy vacation. Murdock asked how things were going and Provance told him about the events that had transpired during his absence. Murdock replied, "They can't do that; that's constructive discharge," and "I don't care what you did, you deserve better treatment than that."

32.   Provance found out later that the County expected him to get a full-blown psychological examination done by a psychiatrist in Helena.

Provance told Hertzog that Provance did not feel comfortable driving to Helena alone, especially with winter weather being forecast. There was also a clinical psychologist available locally, Dr. Watson, that had done work for the County in the past, who could have done a proper inquiry, if justified (and Provance alleges it was not justified), of whether Provance had an anger issue that interfered with his ability to do the essential functions of the job of Bridge and Road Superintendent.

33.    Provance still could not lift any weight with his right arm and his left was too damaged to assist himself in the event of a vehicle breakdown. About a week later and four weeks after being reinstated, Provance received a letter dated October 18, 2012, that Provance would have to see a psychiatrist in Helena on October 29, 2012.

34.    Provance told Hertzog that she knew that Provance would not go and this was an attempt to constructively discharge him, knowing that Provance did not want anyone interfering in his personal life to include everything mental, physical or financial. Provance told her that he was as angry then as the day Mathers decided to intrude into his physical health issues, but Provance was controlled at that time. She told him she knew how Provance felt, since Mathers was pressuring her to get a flu shot, which she is conscientiously opposed to, and she said, would cause her to quit if

forced to get one.

35.   On October 23, 2012, Provance submitted two leave slips for comp time, vacation and sick leave to take his employment through December 14, 2012, and informed the County that he would be retiring effective December 17, 2012. Mathers had indicated at a Department Head meeting in late September, 2012, that the County's ITS Director had abruptly retired and they were allowing him to run out his accrued leave through January.

36.   Provance felt he had no choice but to terminate his position with the County, given the illegal practices it had subjected him to, but he desired to do so in a manner that would allow him to leave his position gracefully and without too much disruption to his Department while the County Commissioners looked for a replacement.

37.   Provance did not want to retire, but he understood that he would be fired if he did not subject myself to the illegal medical examination in Helena.

38.   Mathers signed his leave slips the same day as submitted October 23, 2012, in effect, granting his request to take leave through December 14, 2012.

39.   An editorial and article were published in *The Belgrade News*

on October 26, 2012, concerning Provance's retirement and the circumstances surrounding his upcoming, involuntary retirement.

40.    The 26th of October, 2012, was to be his last day actually at work before going on extended leave for his next surgery and vacation. At about one o'clock p.m. on the 26th of October, 2012, Hertzog called Provance to tell him that Provance had to pick-up a letter at the County's administrative offices at the end of his shift. Upon receiving the letter at about 3 p.m., Provance discovered that Mathers had terminated him, for no stated reason, effective that date.

## STATEMENT OF CLAIM

41.    Gallatin County's wellness program violated the ADA.

42.    Provance believed in good faith that the wellness program violated the ADA.

43.    Provance opposed the legality of the wellness program in good faith.

44.    The Gallatin County Administrator first retaliated against Provance because of his opposition to the illegality of the wellness program by criticizing him for Provance's lawful opposition to it in his February, 2012, Performance Appraisal.

45.    The Gallatin County Administrator violated the ADA when he

directly or indirectly made an illegal medical inquiry to Provance's physician about his rotator cuff surgery.

46.   Provance opposed in good faith the County Administrator's illegal medical inquiry.

47.   Gallatin County illegally retaliated against Provance for opposing the County Administrator's illegal medical inquiry by suspending him without pay and then firing him.

48.   Gallatin County attempted to compel Provance to subject himself to a medical examination in violation of the ADA as a condition of reinstating him.

49.   Gallatin County constructively discharged Provance by forcing him to retire in retaliation for his opposition to the accumulation of violations of the ADA back to his original opposition to the adoption of the wellness program in the first place.

50.   The County had no business necessity for requiring Provance to submit to a wide-ranging mental and physical examination in Helena as a condition of his continued employment.

51.   As the direct and proximate result of the County's illegal actions, Provance was constructively discharged, causing him to lose wages in the form of both back and front pay, to lose fringe benefits, and

experience emotional distress.

52. Provance is entitled to an award of his attorney fees, and his expert witness fees, if any.

WHEREFORE, Plaintiff demands judgment against Defendant for:

A. Back pay in amount to make him whole;

B. Front pay in amount to make him whole;

C. An amount to compensate him for his lost fringe benefits and/or the value of the difference between what he was receiving as fringe benefits while employed by Gallatin County and after his employment with Gallatin County was terminated unlawfully;

D. An amount to compensate him for the emotional distress caused by Gallatin County's illegal actions;

E. His attorney fees;

F. Any expert witness fees he may incur in pursuing this action;

G. Pre- and post-judgment interest;

H. His taxable costs; and,

I. Any other relief which the Court deems just.

### Demand for Jury Trial

Provance requests a jury trial on all questions of fact raised by his Complaint.

Dated this 25th day of October, 2013.

                    KASTING, KAUFFMAN & MERSEN, P.C.


                    /s/William B. Hanson
                    WILLIAM B. HANSON
                    Attorney for Plaintiff